IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **GLORIA JEAN DIXON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **02-1208-CJP[1]** |
| | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | |
| **NATURAL RESOURCES, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**PROUD, Magistrate Judge:**

Plaintiff Gloria Jean Dixon, who is a black African American, filed suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  **(Doc. 1).**  Only plaintiff's retaliation claim against the defendant Illinois Department of Natural Resources proceeded to trial.  **(Doc. 87).**  Plaintiff generally alleges that she was terminated from her job at the Frank Holten State Park in May 2002 in retaliation for filing grievances alleging that she was subjected to a hostile environment and progressive disciplinary action.  **(Doc. 87, pp. 1-3).**

Plaintiff testified that she began work at Frank Holten State Park in January 1999 as an office assistant, performing timekeeping, waiting on customers, answering phones, and other clerical duties.  **(Transcript of Trial ("Tr."), pp. 51 and 53).**  Plaintiff received very positive performance reviews and was promoted to office coordinator in January 2001, although she retained all of the same duties.  **(Tr. pp. 59-60, 62, and 64; and Plaintiff's Exhibits 5 and 54).**

---

[1]In accordance with 28 U.S.C. § 636(c), upon the written consent of the parties, U.S. District Judge Michael J. Reagan referred this action to the undersigned Magistrate Judge for all further proceedings and final resolution.  **(Doc. 66).**

1

Just days after plaintiff's promotion, Ruth Kendall, who is light skinned and of mixed ethnicity, was hired as the assistant site superintendent at the park. **(Tr. pp. 65 and 212).**  When Site Superintendent Curtis Gathing, who is a black African American, was not present, Kendall became the acting site superintendent and therefore had authority to supervise plaintiff.   **(Tr. pp. 66, 212 and 269).**  Gathing's regular days off work were Wednesdays and Thursdays.  **(Tr. pp. 66, 212and 270).**  Because Gathing did not type, Kendall usually did all his typing for him, including e-mail.  **(Tr. pp. 223, 228 and 229).** The office was relatively small, and plaintiff's work area was at the front desk, and Kendall's office was only 20-25 feet away. **(Tr. p. 67).**

Plaintiff received a positive evaluation for the period from January 1, 2001, through May 1, 2001, although her supervisor, Curtis Gathing, testified that plaintiff and Kendall had some disagreements during that period.  **(Tr. pp. 271-273; and Plaintiff's Exhibit 6).**  On May 1, 2001, plaintiff lodged a "discrimination" complaint with Curtis Gathing, which actually only referred to a "hostile environment."  **(Tr. p. 68; (for reference, *see* Doc. 72, Exhibit 22.)).**  According to plaintiff, just after she filed her grievance, she considered Kendall to be "cool and aloof," and not very nice, which made it difficult for plaintiff to work.  **(Tr. p. 69).**

Later in May 2001, plaintiff was charged with failure to perform timekeeping duties, improper remarks, workplace political activity, unauthorized absences and insubordination. **(Plaintiff's Exhibits 8 and 9).**  The charges all stemmed from disagreements with or about Kendall, and charges initiated upon Kendall's complaints to Gathing.  **(Tr. pp. 70, 83-88, 215-217, 221-225, 231 and 274).**  As a result, in June 2001 plaintiff was given a written reprimand regarding failure to perform timekeeping duties and use of inappropriate remarks.  **(Plaintiff's Exhibit 10).**  Kendall and plaintiff continued to spar over timekeeping issues and in September

2001 plaintiff was suspended for one day for false statements and failure to follow instructions **(Tr. pp. 89, 99, 101-107; and Plaintiff's Exhibit 16;** *see also* **Plaintiff's Exhibit 19).**  Plaintiff filed a contract grievance regarding her suspension, which she contends was done to "embarrass her" and cause "more stress and hostility."  **(Plaintiff's Exhibit 17).**

Kendall overheard plaintiff discussing her one day suspension with her sister, Faye Cystrunk, and Kendall told plaintiff to stop talking about her.  **(Tr. pp. 107-108, 237-238).** Cystrunk then came to the park office, purportedly to deliver some curtains to plaintiff, and a dispute erupted involving plaintiff, Cystrunk, Kendall and Gathing, wherein Cystrunk commented to Gathing, Jean is just a black woman trying to make a living," to which Kendall replied, "What am I."   **(Tr. pp. 109, and 238-239).**  The conversation went downhill from there, and plaintiff's and Kendall's respective worth as Christians was debated.  **(Tr. pp. 109-110).**  In December 2001 plaintiff received a ten day suspension (later reduced to five days) for the September 13th incident involving plaintiff's sister.  **(Plaintiff's Exhibits 19 and 20;** *see also* **Plaintiff's Exhibit 24).**  Plaintiff grieved the ten day suspension, for unspecified reasons. **(Plaintiff's Exhibit 21).**

Plaintiff's year-end performance evaluation for 2001 was, admittedly, procedurally flawed, but it generally noted that plaintiff needed to improve.  **(Tr. pp. 292-296, and 299).**

On March 8, 2002, plaintiff arrived at work to find two notes from Kendall; one regarding telephone etiquette, the other raising a time sheet issue.  **(Tr. pp. 120-123).**  An argument between plaintiff and Kendall ensued, and Kendall ordered plaintiff to go home.  **(Tr. pp. 124-125, and 242).**  As plaintiff was walking to her vehicle, she noticed that Gathing was pulling up to the office, so she waited to speak with him.  **(Tr. p. 125).**  Gathing confirmed that

plaintiff had to go home.  **(Tr. p. 125).**  Before plaintiff left, another argument erupted, wherein plaintiff admittedly told Kendall, "Heifer, if you wash your hair and put on some makeup maybe you'll feel better."  **(Tr. p. 126).**  Kendall acknowledges responding, "Would you quit acting like an old hag."  **(Tr. p. 244).**  According to Kendall, plaintiff also stated, "Bring it on, fire me. Go ahead.  Go home and call your white mama.  Go home and raise your kids."  **(Tr. pp. 254 and 355).**  Plaintiff also stated that she was not going home, but when Gathing wrote her a note confirming that she was to leave, she agreed to depart.  **(Tr. pp. 286-287 and 363).**  Park police were summoned due to the commotion.  **(Tr. p. 363).**  Plaintiff left, only to return a few minutes later to drop off some items and get a soda from the refrigerator.  **(Tr. p. 187 and 287).**  Charges were brought by Gathing and plaintiff was suspended for 30 days, pending discharge proceedings.  **(Tr. p. 289; and Plaintiff's Exhibits 25 and 26).**  Plaintiff's discharge for conduct unbecoming an employee and failure to follow instructions was formalized May 7, 2002. **(Plaintiff's Exhibit 24).**

Site superintendent Curtis Gathing, Regional Land Manager Richard Messinger, Director Brent Manning, and Labor Relations Administrator Edward Jackson all testified about the investigation and decision to terminate plaintiff.  **(Tr. pp. 288-290, 337-338, 343-346, 349, 355, 363, 388, and 392-396).**  Kendall was also disciplined for the incident.  **(Tr. p. 399).**

At the close of plaintiff's case-in-chief, the defendant Department moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a).  **(Transcript of Trial ("Tr."), pp. 412-421; and Doc. 99).**  Plaintiff responded orally to the motion and was allotted time within which to file a written response.  **(Tr. pp. 424-434; and Doc. 101).**  However, the Court provisionally granted defendant's Rule 50 motion and concluded trial.  **(Tr. 436-443).**

4

The Court's provisional ruling can be summarized as follows. At the start of trial the parties stipulated that a May 1, 2001, contract grievance was a protected act for purposes of 42 U.S.C. § 2000e-3(a). **(Tr. pp. 4-5).** However, during trial it came to light that the underlying complaint plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") limited the relevant time frame to events occurring after December 1, 2001. **(*See* Plaintiff's Exhibit 28; and Tr. pp. 70-77).** The Court further found that a possible alternate triggering act, a December 28, 2001, grievance fails to mention gender or race and, therefore, is not protected activity for purposes of triggering Title VII protection. **(*See* Plaintiff's Exhibit 21).** Moreover, none of the evidence at trial suggested that the hostile work environment plaintiff complained about had any relation to race or gender discrimination by the defendant Department. Any racial and/or gender animus flowed from plaintiff. This was clearly just two people who could not get along, and the resulting discipline meted out. No questions of material fact or credibility existed to preclude entry of judgment at the close of plaintiff's case-in-chief.

After consideration of plaintiff's brief in opposition to defendant's Rule 50 motion, the Court is not swayed from its preliminary conclusion that the defendant Department is entitled to judgment as a matter of law. The Court hereby **ADOPTS** the rationale offered at trial **(Tr. 436-443)** and offers the following comprehensive analysis.

<u>Analysis</u>

Section 2000e-3(a) makes it unlawful for an employer to discriminate against an employee because the employee opposed a practice made unlawful by Title VII, even if that underlying activity does not itself violate Title VII. **42 USC 2000e-3(a); and *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994).** In other words, Title VII

5

protects an employee from "retaliation for complaining about the types of discrimination it prohibits." ***Miller v. American Family Mutual Insurance Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).**  "To establish a *prima facie* case for unlawful retaliation, a plaintiff must prove three elements: (1) she engaged in statutorily-protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action." ***Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (quoting *Krause v. City of La Crosse,* 246 F.3d 995, 1000 (7th Cir. 2001)).**

When trial commenced, the parties stipulated that the protected act was a May 1, 2001, grievance that contained the phrase "hostile environment."  However, after the start of plaintiff's testimony, defense counsel brought to the Court's attention that the EEOC complaint specifies the discrimination took place, *at the earliest*, December 1, 2001, and at the latest, May 8, 2002. **(*See* Plaintiff's Exhibit 28).**   A Title VII plaintiff is limited to claims included in his or her EEOC complaint. ***McGoffney v. Vigo County Division of Family and Children*, 389 F.3d 750, 752 (7th Cir. 2004).**  Accordingly, the Court limited the claim to events after December 1, 2001.

Plaintiff notes that she filed her EEOC complaint without the assistance of counsel and, along with the specified time frame, she indicated there was a "continuing violation."  **(*See* Plaintiff's Exhibit 28).**  Plaintiff argues that the retaliation was triggered by her May 1, 2001, contract grievance, alleging she was working in a "hostile environment."[2]  Plaintiff further asserts that, due to the progressive disciplinary scheme prescribed by union contract, the defendant Department engaged in a pattern of conduct after that initial grievance, intending to

---

[2]At the start of trial the parties stipulated that the May 1, 2001, grievance was a protected act for purposes of 42 U.S.C. § 2000e-3(a).  **(Tr. pp. 4-5).**  Accordingly, the actual document was not an exhibit at trial.  For reference, the grievance is in the record at Doc. 72, Exhibit 22.

provoke plaintiff to act in a manner that would elicit further discipline until the procedural prerequisites for termination were met.  Plaintiff implies that she did not perceive that she was being set-up to be discharged until the ten day suspension was imposed in December 2001. **(Plaintiff's Exhibit 28).**   Therefore, plaintiff would have her claim encompass the period from her initial grievance on May 1, 2001, through May 8, 2002, when she was discharged.

Plaintiff's EEOC complaint specifically lists the disciplinary actions she perceives as unwarranted:  (1) her ten day suspension December 17-27, 2001; (2) her May 8, 2002, suspension pending discharge; and (3) her actual discharge.  **(Plaintiff's Exhibit 28).**  Nothing prior to December 1, 2001, is noted in the EEOC complaint, so there is no cause to expand the time frame beyond the dates and series of events in the EEOC complaint, which themselves can be characterized as a continuing violation.  Therefore, in accordance with *McGoffney*, the actionable retaliation had to have occurred *after* December 1, 2001.  In any event, the Court gave plaintiff wide latitude at trial and all events between May 1, 2001, and May 8, 2002, were presented.  Nevertheless, for reasons addressed below, plaintiff's case is fatally flawed.

Relative to the first element of plaintiff's case, the protected activity, the Court's ruling about the relevant time frame forced plaintiff to rely upon her December 28, 2001, contract grievance **(Plaintiff's Exhibit 21)** as the triggering protected activity.  However, that grievance states only: "This is to grieve the 10 day suspension issued as of 12-17-01."  **(Plaintiff's Exhibit 21).**  "Although an employee need not use magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender or race] is an issue.'"  ***Sitar v. Indiana Dept. Of Transportation*, 344 F.3d 720, 727 (7th Cir. 2003).**  "Usually a claim for retaliation is preceded by an obligatory complaint about

discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity." ***Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003).** This is particularly key to a retaliation action because, "An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." ***Sitar v. Indiana Dept. Of Transportation*, 344 F.3d 720, 727 (7th Cir. 2003).** The December 28, 2001, grievance, on its face, clearly does not convey sufficient knowledge of a complaint about the types of discrimination Title VII prohibits (race and gender).

A Title VII plaintiff may also rely on circumstantial evidence to establish her employer's awareness of protected expression, and extraneous evidence can be used for that purpose. ***Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994); and *Hamner v. St. Vincent Hospital and Health Care Center*, 224 F.3d 701705-706 (7th Cir. 2000).** Thus, the Court gave plaintiff wide latitude in presenting her case, and allowed a tremendous amount of evidence of activities in the months prior to December 2001. However, regardless of whether one looks back as far as May 2001, or just from December 1, 2001, there is <u>no</u> evidence of anything from which the defendant Department could infer awareness of racial or gender discrimination, let alone protected activity.[3]

By plaintiff's own account, just after she filed her grievance on May 2001 she considered

_____

[3]It is axiomatic that a plaintiff engage in statutorily protected activity *before* an employer can retaliate against her for engaging in statutorily protected activity." ***Durkin v. City of Chicago*, 341 F.3d 606, 614-615 (7th Cir. 2003) (emphasis added).** The EEOC complaint does reflect plaintiff's belief that she had been discriminated against "in retaliation for [her] race, black and age, 58 in violation of Title VII." **(Plaintiff's Exhibit 28).** However, the EEOC complaint was filed after plaintiff was discharged.

Kendall to be "cool and aloof," and not very nice, which made it difficult for plaintiff to work.

**(Tr. p. 69).**  All of the disputes that arose between plaintiff and her intermediate supervisor Ruth

Kendall related to work and personality issues, not race or gender.  Plaintiff testified that she felt

Kendall goaded her and provoked the "overall atmosphere in the office." **(Tr. p. 127).**

According to plaintiff, nothing she ever did satisfied Kendall; Kendall always complained about

plaintiff's timekeeping "Because she disagreed with me," and she wanted to degrade plaintiff.

**(Tr. pp. 202-204).** Plaintiff made no mention of racial or gender animosity in her testimony, and

there is simply nothing from which to infer any causal connection between the charges and

disciplinary action taken and race or gender.  Therefore, plaintiff has failed to establish she

engaged in statutorily-protected expression because she in no way communicated or intimated to

the Department that she had any issues regarding race or gender, and there is no extraneous

evidence implicating Title VII protected expression.

With respect to the second element– an adverse employment action, although the parties

did not stipulate to the sequence of disciplinary actions taken against plaintiff which lead to her

termination, there was ample undisputed evidence that plaintiff was charged and/or disciplined

as follows:

> May 8 and 10, 2001:
> > Charged with failure to perform timekeeping duties, improper remarks, workplace political activity, unauthorized absences and insubordination.  **(Plaintiff's Exhibits 8 and 9).**

> June 8, 2001:
> > Written reprimand issued regarding failure to perform timekeeping duties and use of inappropriate remarks.  **(Plaintiff's Exhibit 10).**

> July 5, 2001:
> > Charged with failure to perform timekeeping duties, failure to follow instructions regarding Kendall's time sheet, and alteration of Kendall's time sheet.

9

**(Plaintiff's Exhibit 14).**

September 12, 2001:
Suspension (1 day) for false statements and failure to follow instructions **(Plaintiff's Exhibit 16; *see also* Plaintiff's Exhibit 19).**

December 17, 2001:
Suspension (10 days/later reduced to 5 days) for September 13, 2001 incident involving plaintiff's sister's presence at the site and a conflict between the sister and Kendall.  **(Plaintiff's Exhibits 19 and 20; *see also* Plaintiff's Exhibit 24).**

April 8, 2002:
Suspension pending discharge (30 days) for March 8, 2002, incident with Kendall and resulting charges of conduct unbecoming an employee and failure to follow instructions.  **(Plaintiff's Exhibits 25 and 26).**

May 7, 2002:
Discharge for March 8, 2002, incident.  **(Plaintiff's Exhibit 24).**

Regardless of arguments about the validity or propriety of the aforementioned charges and/or disciplinary action, there can be no doubt that the second element of the *prima facie* case– adverse employment action– is established.

The third element of the *prima facie* case is a  a causal link between the protected expression and the adverse action.  The same lack of evidence of any sort of racial or gender animus that doomed plaintiff's attempt to show that she had engaged in protected activity prevents her from establishing that the adverse employment actions taken against her were causally connected with any alleged protected expression.  At trial plaintiff never opined or implied that any of the disputes she had with Kendall that lead to charges and/or discipline stemmed from racial animus, and there was no evidence from which to draw such an inference.

Plaintiff also suggests a "cat's paw" scenario, wherein Ruth Kendall's word went unquestioned and was not really investigated, and Kendall essentially dictated the discipline that

would be handed down.  Even assuming Kendall was motivated by the inappropriate remarks plaintiff allegedly made about Kendall's race (which plaintiff denied making), Site Superintendent Curtis Gathing testified that Kendall had no input in the lodging of charges and disciplinary recommendations or decisions affecting plaintiff, aside from being involved in the incidents upon which charges were based.  **(Tr. pp. 274, 290).**   Richard Messinger, the Regional Land Manager, testified that his role was to investigate charges, although he also relied upon all of the information and statements gathered at the site.  **(Tr. pp. 332, 337-338, and 343-344).** Brent Manning, Director of the Department of Natural Resources, also testified that he relied on the accumulated evidence and reports in making the ultimate decision to discharge plaintiff.  **(Tr. p. 388).**  Edward Jackson, the Department's labor relations administrator, explained that the decision to terminate plaintiff was a collective decision involving himself, and several other administrators, after a review of the investigation materials.  **(Tr. pp. 394-396).**  There is simply no evidence to support plaintiff's assertion that the charges and disciplinary recommendations and decisions stemmed from a failure to properly investigate Kendall's allegations, or from any sort of influence by Kendall.  Moreover, plaintiff has not contested that any of the disputes occurred, nor has she claimed the disputes and resulting charges and/or discipline had anything to do with racial or gender animus.


**IT IS THEREFORE ORDERED** that, for the aforestated reasons, the defendant Illinois Department of Natural Resources' Rule 50 motion for judgment **(Doc. 99)** is **GRANTED**. Judgement shall enter accordingly, in favor of the defendant and against plaintiff.  Plaintiff shall take nothing from this action.

11

**IT IS SO ORDERED.**

**DATED: March 31, 2006**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**